# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>**LINDOLFO RENE VARELA, JR.,**<br><br>　　　　　Defendant. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**<br><br>Case No. 2:05CR364 DAK |

　　　　This matter is before the court on Defendant Lindolfo Rene Varela, Jr.'s Motion to Suppress. Specifically, Mr. Varela seeks to suppress all evidence obtained from him as the result of an alleged illegal detention and search on April 5, 2005.

　　　　An evidentiary hearing on the Motion to Suppress was held on November 3, 2005. At the hearing, Defendant was represented by Benjamin A. Hamilton, and the United States was represented by Vernon G. Stejskal. Both parties later submitted briefs, and oral argument was heard on December 19, 2005. Before the December 19, 2005 hearing, the court carefully considered all pleadings, memoranda, and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Findings of Fact and Conclusions of Law and Order.

**FINDINGS OF FACT**

On April 5, 2005, agents from the Drug Enforcement Agency ("DEA") had obtained a search warrant for a house on Kimberly Circle in Salt Lake City, Utah and for a 1996 Burgundy Ford Explorer with Utah plates 903 WAX. After obtaining the warrant for the residence and the vehicle, the DEA agents went to the residence described in the warrant to establish surveillance in the area. While they were there, they saw the Ford Explorer described in the warrant. The agents observed the occupants of the vehicle entering the residence described in the search warrant. One of the individuals was later identified as Mr. Varela. The men subsequently came out of the residence with a third person, and they all left in the Ford Explorer. The agents knew one of the occupants from a prior drug sale and they believed that another of the individuals was a subject they had seen on two prior drug sales. The agents then followed the vehicle in an attempt to gather some intelligence on who they were and their movements.

After a couple hours, the DEA agent pulled up alongside a Salt Lake City patrol car. After identifying himself, one of the DEA agents asked the officers to see if there were any violations on the burgundy Ford Explorer that was in front of the officers. They wanted to stop the car to identify the occupants. One of the individuals was dropped off before the car was stopped.

Officer Hanks then ran the license plate number that was on the Ford. The state computer showed that the registration had expired at the end of March 2005–and it was currently April 5, 2005. Officer Hanks credibly testified that he could not see the registration sticker from where he was behind the Explorer, and he noted that while he was able to see the license plate

numbers, they are bigger than the registration sticker. He also testified that even if he had been able to see the color of the sticker, only three or four colors are used. Because the same colors are rotated every three or four years, he does not necessary depend on the color of the sticker to make his determination.

Office Hanks then initiated a traffic stop based on the expired registration. After stopping the car, Officer Hanks noticed that the car had a registration sticker that indicated a March 2006–not 2005 as indicated on the computer database–registration sticker. Because the state computer had shown an expired registration, and because Officer Hanks had encountered stolen stickers in his experience as a patrol officer, he continued with the stop.

Mr. Varela was the driver of the car. Officer Hanks, as was his custom, checked the paper registration to ensure that the sticker was legitimate. The paper registration indicated that the sticker was legitimate and the registration was current.[1] Mr. Varela, however, did not have a driver's license. In addition, the front seat passenger did not have a valid driver's license. Consequently, Officer Hanks informed them that the vehicle would be impounded because there was no licensed driver. According to Officer Hanks' testimony, when a vehicle is to be impounded there are several procedures that take place, including an inventory of the vehicle's contents and forms that need to be filled out. These procedures would necessarily take additional time beyond that of an initial traffic stop.

---

[1] Ms. Lynette Byrd from the Department of Motor Vehicles ("DMV") testified that the registration on the vehicle in question was renewed on April 4, 2005–the day before the traffic stop in question. Certain databases that receive downloaded information from the DMV, however, could be behind by approximately 48 hours, especially at the beginning of a month, when a large number of registration renewals are taking place.

After informing Mr. Varela that the car would be impounded, Officer Hanks noticed that Mr. Varela, was wearing thick, heavy clothing.  It was approximately 60-65 degrees that day, but Mr. Varela had on a fleece-lined ski jacket, and he was sweating.  He also appeared nervous.  Officer Hanks experience on the west side of Salt Lake was that people wore big clothing to "hide stuff."  Officer Hanks determined, based on his experience, that a *Terry* frisk was necessary to ensure that Mr. Varela's baggy clothing was not being used to conceal a weapon that could present a risk to the officers as the vehicle was being processed for impound.  Officer Hanks asked Mr. Varela to exit the vehicle, and before conducting the frisk, he informed Mr. Varela that he would pat him down for weapons and instructed defendant Varela to place his hands behind his back.  Officer Hanks asked Mr. Varela if he had any guns, knives, or anything on his person that would cut or poke the officer.

Mr. Varela stated that he had no such weapons but that he did have drugs.  At that time, Officer Hanks told him that he was under arrest because he had just admitted to committing a felony.  Officer Hanks told him that he would be seizing the drugs out of his pocket for evidence.  The officer then reached into Mr. Varela's pocket and obtained the evidence.   The narcotics found in Mr. Varela's possession were methamphetamine, cocaine, and marijuana.

## CONCLUSIONS OF LAW

The initial traffic stop of the vehicle was lawful.  Only reasonable suspicion is necessary to justify a traffic stop. *United States v. Cline*, 349 F.3d 1276, 1287 n.9 (10th Cir. 2003) (citing *United States v. Cervine*, 347 F.3d 865, 869 n.2 (10th Cir. 2003)).  Officer Hanks had a reasonable suspicion that Mr. Varela's vehicle was not properly registered.  Utah law states that motor vehicles must be registered before they can be operated.  Utah Code Ann. § 41-1a-201.

Officer Hanks ran the license plate number from the burgundy Ford Explorer that was being driven by Mr. Varela. He had obtained this license plate number by visually observing the number on the rear license plate. The state computer used by the Salt Lake City Police Department showed that the vehicle's registration was expired. Based on this information, Officer Hanks initiated a traffic stop. After stopping Mr. Varela, Officer Hanks noticed a sticker on the rear license plate that showed a current registration, but Officer Hanks still had reasonable suspicion that the registration was expired because he had already found that the state computer showed the registration to be expired. Officer Hanks knew based on his experience that registration stickers can be stolen and placed on the wrong vehicle. Officer Hanks was able to verify, as a result of the stop, that the registration had not expired when he received and reviewed the actual paper registration. The court finds that it was reasonable to rely on the state database in determining to initiate the stop. There was no evidence that Officer Hanks had knowledge that the state computer could lag behind by up to two days. Thus, Officer Hanks had a reasonable suspicion that a traffic offense had occurred and that a stop should be made.[2]

If an officer's action was justified at the inception of the traffic stop, the court must then ask whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Cline*, 349 F.3d at 1286 (internal citations omitted). "An investigative detention may be expanded beyond its original purposed" on the basis of reasonable suspicion. *United States v.*

---

[2] Moreover, even aside from the vehicle registration issue, the DEA agents had obtained a warrant to search the vehicle, which also justified the stop of the vehicle.

*Villa-Chaparro*, 115 F.3d 797, 801-802 (10th Cir. 1997) (citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995)).

Officer Hanks did nothing during the traffic stop that was outside of the scope of the investigation for the traffic stop. Although the stop was lengthened, this delay was caused not by any questioning by Officer Hanks, but rather by the absence of a legally licensed driver and the resulting necessity of impounding the vehicle. The *Terry* frisk of Mr. Varela did not take place until the officers returned to the vehicle to remove the occupants from the vehicle as part of the impounding procedure.

The *Terry* frisk of Mr. Varela was constitutionally reasonable. Officer Hanks conducted a *Terry* frisk of defendant Varela in order to ensure his and other officers' safety after Mr. Varela exited the vehicle. An officer may conduct a protective frisk of the driver's person if the officer has a "reasonable suspicion based on specific and articulable facts that a properly detained driver may be dangerous and may gain immediate control of weapons." *United States v. Palmer*, 360 F.3d 1243, 1246 (10th Cir. 1997) (internal citations omitted). "Immediate control of weapons" refers to the potential access to weapons anytime during a proper detention. *Id.* (citing *Michigan v. Long*, 463 U.S. 1032, 1051-1052 (1983)).

Whether a subsequent detention is supported by objectively reasonable suspicion of illegal activity depends on the totality of the circumstances. *United States v. Oliver*, 363 F.3d 1061, 1066 (10th Cir. 2004) (citation omitted). Law enforcement officials are entitled to deference in "distinguish[ing] between innocent and suspicious actions," for their inferences and deductions based on their experience and specialized training, and for their determinations of whether probable cause existed. *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005)

(internal citations omitted).

When viewed in the totality of the circumstances, and giving deference to Officer Hanks' distinction between innocent and suspicious actions, Officer Hanks reasonably suspected that defendant Varela might have concealed weapons on his person. DEA agents investigating suspected narcotics trafficking had requested Officer Hanks to initiate a stop of the vehicle Mr. Varela was driving. Officer Hanks noted that Mr. Varela was sweating, acting nervous, and was wearing a bulky coat on a warm day. Officer Hanks has been a law enforcement officer for seven and one-half years, and based on his experience in patrolling that area of Salt Lake City, believed that individuals wear "big clothing" to hide things such as weapons. Officer Hanks determined that for the officers' safety, it was necessary to conduct a *Terry* frisk. Given the totality of the circumstances, Officer Hanks' decision to conduct a *Terry* frisk was objectively reasonable.

When Mr. Varela was asked about having any weapons on him, he volunteered that he did not have any weapons, but that he had drugs in his pocket. Because Mr. Varela was still lawfully detained while the vehicle was being impounded, and because he admitted to a felony law violation, Officer Hanks' retrieval of drugs from Mr. Varela's pocket was constitutionally justified.

In addition to the *Terry* frisk, DEA had a search warrant signed that day which authorized a search of the Explorer in which Mr. Varela (driver) and Mr. Quijada (passenger) were found. Like a search warrant for a house, it is not unreasonable to conduct a *Terry* frisk of all persons located within that vehicle for officer safety. As Varela was in the vehicle when the vehicle was stopped and was to be searched pursuant to the warrant, Varela could be patted down for officer

safety in the absence of any other justification.[3]

Mr. Varela's statement to Officer Hanks was not made in violation of his *Miranda* rights. Police officers are not required to read *Miranda* rights to everyone they question. *U.S. v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (citation omitted). *Miranda* only applies when a person is subject to "'custodial interrogation.'" *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Traffic stops, although considered seizures under the Fourth Amendment, "are not, however, necessarily custodial in the *Miranda* sense." *Id.* at 1191 (reference to *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). *Terry* stops also fall under the category of stops that do not usually require that *Miranda* warnings be given. *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) (citation to *Berkemer*, 468 U.S. at 437-440). Officers may also ask a "moderate number of questions" during the *Terry* stop "to try to obtain information confirming or dispelling the officer's suspicion." *Id.* (citations omitted).

In *United States v. Griffin*, the court discussed several factors that are relevant in determining whether a suspect is in custody. One factor is whether the suspect is "made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* at 1518 (citations omitted). Another factor is whether "prolonged accusatory questioning . . . likely to create a coercive environment from which an individual would not feel free to leave" was present. *Id.* Another factor is whether there was a "police dominated atmosphere." *Id.* (citing *Berkemer*, 468 U.S. at 439).

In this case, Mr. Varela was not in custody. He had not been arrested. The detention was

---

[3] Furthermore, the DEA agents had reasonable suspicion to believe that the occupants of the vehicle were involved in drug trafficking activity on that date.

8

brief, and the only purpose of the detention was to determine whether Mr. Varela possessed potentially dangerous weapons.  While he was not specifically told that he was free to leave or free to refrain from answering questions, he was asked only one question at the beginning of the search, a question designed not to discover evidence, but to protect the officer.  There was no prolonged questioning, and it did not take place in a police dominated atmosphere. Because it was a *Terry* frisk that was not prolonged or accompanied by intensive questioning, the officers were not required to advise Mr. Varela of his *Miranda* rights.

      The court finds that Mr. Varela's statement about possessing drugs was voluntary. Several factors may be considered to determine whether a suspect's statement or confession was made voluntarily.  These factors include "age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and interrogation, and the use or threat of physical force." *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) (citing *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998)).

      Mr.  Varela was 19 years old at the time of the traffic stop.  The "interrogation" consisted of one simple question, designed to help protect the officer conducting the frisk. Although Mr. Varela was not informed of his rights, he was informed about the officer's potential actions and was given a chance to prevent harm to the officer.  He was not asked if he possessed narcotics, only if he had anything on his person that could harm the officer.  There was no threat of physical force.

      Mr. Varela's confession cannot be defined as involuntary. The officer's question was not designed to elicit information or to discover evidence of other crimes, but rather was

9

only designed to protect the officer.  In fact, Varela's statement was not a direct answer to the question posed, but was a statement about an unrelated crime being committed in the officers' presence.  Therefore the discovery of evidence based on Varela's statement was constitutionally permissible.

In conclusion, the initial traffic stop was proper and lawful both in its inception and scope.  The traffic stop was based on a reasonable, articulable suspicion that Mr. Varela was operating an unregistered vehicle on a public highway. Officer Hanks reasonably suspected that Mr. Varela's clothing, which was not suitable for the weather that day, could be used to conceal a dangerous weapon, particularly in light of Mr. Varela's sweating and nervous demeanor.  Thus, the *Terry* frisk was appropriate.  Because Mr. Varela was not in custody, the officers were not required to advise him of his *Miranda* rights.   Mr. Varela's confession was a voluntary statement, not the product of any coercion on the part of the police.  For the foregoing reasons, the court finds that  the evidence was seized in a constitutionally reasonable manner.

## **CONCLUSION**

Based on the foregoing reasons, IT IS HEREBY ORDERED that Defendant Lindolfo Rene Varela, Jr.'s  Motion to Suppress is DENIED.

DATED this 17th day of January, 2006.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge